**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| STRATACOR LLC,<br><br>Plaintiff,<br><br>v.<br><br>LG ELECTRONICS INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 2:26-cv-00<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Stratacor LLC ("Stratacor" or "Plaintiff") for its Complaint against Defendant LG Electronics Inc. ("LG" or "Defendant") for patent infringement alleges as follows:

## THE PARTIES

1. Stratacor is a limited liability company, organized and existing under the laws of the State of Texas, with its principal place of business located at 104 East Houston Street, Marshall, Texas 75670.

2. On information and belief, Defendant LG Electronics Inc. is a Korean corporation with a principal place of business at LG Twin Towers, 128 Yeoui-daero, Yeongdungpo-gu, Seoul, South Korea, and may be served pursuant to the Hague Convention. On information and belief, LG does business in the Eastern District of Texas, directly or through intermediaries, by at least offering its products and/or services, including the Accused Products (defined below), which are accused of infringement herein, to customers and potential customers located in the State of Texas, including within this District.

## JURISDICTION AND VENUE

3. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

4. This Court has specific and personal jurisdiction over the Defendant consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute. On information and belief, the Defendant has sufficient minimum contacts with the forum because Defendant transacts substantial business in the State of Texas and in this Judicial District. Further, Defendant has, directly or through subsidiaries or intermediaries, committed acts of patent infringement in the State of Texas and in this Judicial District as alleged in this Complaint, including more specifically below.

5. In addition, or in the alternative, this Court has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(2), because the claims for patent infringement in this action arise under federal patent law, Defendant is not subject to the jurisdiction of the courts of general jurisdiction of any state, and exercising jurisdiction over Defendant is consistent with the United States Constitution.

6. Venue is proper in this Judicial District because Defendant is a foreign corporation formed under the laws of the Republic of Korea, with a principal place of business in the Republic of Korea. 28 U.S.C. § 1391(c)(3) provides that "a defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants." *See also In re HTC Corp.*, 889 F.3d 1349, 1358-61 (Fed. Cir. 2018). Further, upon information and belief, the Defendant has admitted or not contested proper venue in this Judicial District in other patent

infringement actions. *See, e.g., Nanoco Technologies Ltd. v. LG Electronics Inc., et al.*, Case No. 2:25-cv-00431-JRG, Dkt. No. 23 (E.D. Tex. Aug. 29, 2025).

## PATENT-IN-SUIT

7. On February 22, 2022, the United State Patent and Trademark Office duly and legally issued U.S. Patent No. 11,257,115 (the "'115 Patent") entitled "Providing Additional Digital Content or Advertising Based on Analysis of Specific Interest in the Digital Content Being Viewed". A true and correct copy of the '115 Patent is available at: https://patentimages.storage.googleapis.com/52/bf/d5/cd737a85244d06/US11257115.pdf.

8. Stratacor is the sole and exclusive owner of all right, title, and interest in the '115 Patent (the "Patent-in-Suit") and holds the exclusive right to take all actions necessary to enforce its rights to the Patent-in-Suit, including the filing of this patent infringement lawsuit. Stratacor also has the right to recover all damages for past, present, and future infringement of the Patent-in-Suit and to seek injunctive relief as appropriate under the law.

9. Stratacor has at all times complied with the marking provisions of 35 U.S.C. § 287 with respect to the Patent-in-Suit. Upon information and belief, prior assignees and licensees have also complied with the marking provisions of 35 U.S.C. § 287.

## FACTUAL ALLEGATIONS

10. The '115 Patent generally relates to providing additional relevant content to a viewer of digital media. The technology described in the '115 Patent was developed by inventor Gil Emanuel Fuchs. By way of example, this technology is implemented in Websites and Apps that monitor user viewing activity, associate the viewing material with words, and curate further internet content based on the associated words. For example, the technology is implemented today in LG smart televisions with the Netflix streaming application and/or LG webOS, either separately

or together, and an LG Magic Remote, including, but not limited to, OLED televisions (e.g., A2, B2, B3, B4, B5, B6, C2, C3, C4, C5, C6, C6H, Flex LX3Q, G2, G3, G4, G5, G6, M3, M5, Posé LX1Q, T4, W6, and Z2; QNED televisions (e.g., QNED75, QNED80, QNED80T, QNED82A, QNED84B, QNED85, QNED85A, QNED85T, QNED89T, QNED90, QNED90T, QNED92A, QNED92B, QNED95, QNED99, and QNED9MA); NanoCell televisions (e.g., NANO75 and NANO80); UHD televisions (e.g., UQ8000, UQ9000, UR8000, UR9000, UT8000, UT9000, UA7700, and UA9000); Micro RGB televisions (e.g., MRGB95B); and Gallery televisions (e.g., LX7B), including all variations, among other LG products (collectively, the "Accused Products").

11. LG has infringed and is continuing to infringe the Patent-in-Suit by making, using, selling, offering to sell, and/or importing, and by actively inducing others to make, use, sell, offer to sell, and/or importing, products including, but not limited, the Accused Products.

**COUNT I**
**(Infringement of the '115 Patent)**

12. Paragraphs 1 through 11 are incorporated by reference as if fully set forth herein.

13. Stratacor has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products that embody the inventions of the '115 Patent.

14. Defendant has and continues to directly infringe the '115 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '115 Patent. Such infringing products include LG smart televisions with the Netflix application and the LG Magic Remote, including, but not limited to, the LG 65-inch OLED evo AI G6 4K Smart TV (OLED65G6WUA), including its webOS 26 platform, preinstalled Netflix application, and included AI Magic Remote MR26, among other LG products.

15. For example, Defendant has and continues to directly infringe at least claim 1 of the '115 Patent by making, using, offering to sell, selling, and/or importing into the United States products that include the LG 65-inch OLED evo AI G6 4K Smart TV, among other LG products. The LG 65-inch OLED evo AI G6 4K Smart TV is exemplary and representative of how the Accused Products infringe the '115 Patent.

16. The LG 65-inch OLED evo AI G6 4K Smart TV performs a method to supply relevant internet-based content (e.g., Netflix movies, television programs, games, title artwork, trailers, synopses, and recommendation rows) to at least one viewer (e.g., the logged-in Netflix profile using the LG television) of one or more internet pages (e.g., the Netflix TV homepage, My Netflix page, Movies page, or title-details page). The LG 65-inch OLED evo AI G6 4K Smart TV performs the step of dividing the one or more internet pages into regions using a processing unit (e.g., the LG television's processor executing the Netflix client and/or Netflix server processors constructing the page), wherein the regions (e.g., Continue Watching, My List, Top 10, New on Netflix, Comedies, Crime Thrillers, or Because You Watched rows) are defined by a form of the content (e.g., the row heading, horizontal row boundaries, title-card layout, section ID, section position, or type of titles grouped in the row) of the one or more internet pages.

## Schema Design

With the GraphQL operation set, we turned our attention to the schema design. There, we encountered some technical challenges which we will illustrate next.

First, consider the following schema in GraphQL with a basic page that contains a list of sections.

```
type Page {
  id: ID
  timestamp: Long
  sections: [Section]
}

type Section {
  id: ID
  title: String
}
```

### Cache Normalization for Sections

To help address the efficiency aspect, we worked with Netflix TV and mobile client engineers to explore GraphQL client cache normalization for Sections. Rather than storing the Sections and all of the corresponding data under the Page entry in the client cache, we stored separate entries for each Section using normalization ids and used references to those Sections in the Page entry. Here is a visual representation of this difference:

**Without Normalization**

```
{
  page:1234: {
    timestamp: 1735763430000,
    sections: [
      {
        id: 1,
        title: "first section",
        ...
      },
      {
        id: 2,
        title: "second section",
        ...
      }
    ]
}
```

**With Normalization**

```
{
  page:1234: {
    timestamp: 1735770630000,
    sections: [
      ${section:1}, // reference
      ${section:2}  // reference
    ]
  }
}

section:1: {
  id: 1,
  title: "first section",
  ...
}

section:2: {
  id: 2,
  title: "second section",
  ...
}
```

[1]

17. The LG 65-inch OLED evo AI G6 4K Smart TV performs the step of monitoring and tracking the frequency and duration of viewing by the at least one viewer of each region using input devices (e.g., the LG Magic Remote) functionally connected to the processing unit, wherein the tracking of the frequency (e.g., counting how many times the pointer enters the row, how many title cards in the row receive impressions, or how often the viewer returns to the row) and duration (e.g., measuring the elapsed time between cursor entry and exit, the time spent moving among

[1] https://netflixtechblog.com/unlocking-dynamic-pages-the-evolution-of-netflixs-client-server-graphql-apis-8b4631a59b39.

cards in the row, or cumulative pointer residence within the row) of viewing by the viewer comprises at least one of monitoring the location (e.g., cursor X/Y position or the Netflix title-card element beneath the cursor) and duration time (e.g., the difference between the entry-event timestamp and exit-event timestamp) of a pointing device (e.g., the LG Magic Remote in pointer mode) within the confines of each region (e.g., the rectangular screen boundaries of a row or a particular movie/television poster), and intervals where the pointing device does not move for periods longer than a pre-defined threshold time period (e.g., a period seconds of no cursor movement or hovering over a row or movie/television poster) are not recorded.

> - **Pointer mode**:
>
>   The remote control works similarly to a mouse (or, we prefer to refer to a wand). You can point or select items, or scroll up or down using the wheel. You can use the standard JavaScript events for the mouse, such as the**onmouseover** event and the**onclick** event.

[2]

---

[2] https://webostv.developer.lge.com/develop/guides/magic-remote.

**Key, Voice, Pointer**

The traditional way for users to control our UI on a game console or TV is via an LRUD input (left/right/up/down) such as a TV remote control or game controller. Additionally, Xbox 360 users should be able to navigate with voice commands and folks with an LG Magic Remote Smart TV must be able to navigate by pointing their remote control at elements on screen. Our new UI is our first to incorporate all three input methods in a single design.

We wanted to build our view components in such a way that their interaction behaviors are encapsulated. This code proximity makes code more maintainable and reusable and the class hierarchy more robust. We needed a consistent way to dispatch the three kinds of user input events to the view hierarchy.

We created a new JavaScript event dispatcher that routes key, pointer, and voice input in a uniform way to views. We needed an incremental solution that didn't require refactoring the whole codebase, so we designed it to coexist with our legacy key handling and provide a migration path.

We must produce JavaScript builds that only contain code for those methods supported by the target device because reduced code size yields faster code parsing, in turn reducing startup time. [3]

Imagine scrolling through Netflix, where each movie poster or promotional banner competes for your attention. Every image you hover over isn't just a visual placeholder; it's a critical data point that fuels our sophisticated personalization engine. At Netflix, we call these images 'impressions,' and they play a pivotal role in transforming your interaction from simple browsing into an immersive binge-watching experience, all tailored to your unique tastes.

Capturing these moments and turning them into a personalized journey is no simple feat. It requires a state-of-the-art system that can track and process these impressions while maintaining a detailed history of each profile's exposure. This nuanced integration of data and technology empowers us to offer bespoke content recommendations.

[3] https://netflixtechblog.com/building-the-new-netflix-experience-for-tv-920d71d875de.

### Enhanced Personalization

To tailor recommendations more effectively, it's crucial to track what content a user has already encountered. Having impression history helps us achieve this by allowing us to identify content that has been displayed on the homepage but not engaged with, helping us deliver fresh, engaging recommendations.

### Frequency Capping

By maintaining a history of impressions, we can implement frequency capping to prevent over-exposure to the same content. This ensures users aren't repeatedly shown identical options, keeping the viewing experience vibrant and reducing the risk of frustration or disengagement.

#### Filtering & Enriching Raw Impressions

Once the raw impression events are queued, a stateless Apache Flink job takes charge, meticulously processing this data. It filters out any invalid entries and enriches the valid ones with additional metadata, such as show or movie title details, and the specific page and row location where each impression was presented to users. This refined output is then structured using an Avro schema, establishing a definitive source of truth for Netflix's impression data. The enriched data is seamlessly accessible for both real-time applications via Kafka and historical analysis through storage in an Apache Iceberg table. This dual availability ensures immediate processing capabilities alongside comprehensive long-term data retention.




Impression Source-of-Truth architecture [4]

[4] https://netflixtechblog.com/introducing-impressions-at-netflix-e2b67c88c9fb.

## Triggers for Page Updates

Now that we've explained the mechanics behind the GraphQL mutation schema, we will discuss when the device will use it to fetch a page update. For this, we introduce the concept of triggers. A trigger is an event that causes the device to ask the server for a page update. These include user-initiated actions as well as app-driven events such as expirations and server notifications.

### Trigger Actions

The trigger schema also includes an action field, which instructs the device on how it should respond when the triggering conditions are met. Some of these actions include:

- **NewPage**: Instructs the client to load an entirely new page.
- **UpdatePage**: Tells the client to refresh specific sections without reloading the entire page.
- **ApplyPrefetchedData**: Directs the client to use data that was prefetched in anticipation of an update instead of calling the server.
- **NavigateToAppStore**: Guides the client to open the App Store, which might be needed for actions like game downloads.
- **OpenGame**: Switches the client into a gaming mode when necessary.

This flexible approach allows us to specify different client behavior based on the context as well as modify that behavior later on. For example, on the homepage, a "PlaybackEndTrigger" might result in a page update, but on a different page, it might result in a new page load using a different action.

### Handling the UpdatePageAction Type

We will now look more closely at the `UpdatePageAction` type defined below. This action can be associated with any trigger, and when the trigger occurs, the client calls the server using the `updatePage` mutation, passing in the associated action id as a parameter to the mutation.

```
type UpdatePageAction {
   actionId: ID
}

mutation updatePage(pageId: String!, actionId: ID): UpdatePageResult // new acti
```

The `actionId` is a token generated by the server and encoded with information about the associated context including the originating section and page. This allows the server to independently decide how to modify the page. Potential modifications include modifying a section to add or remove items, inserting a new section at a specific location, or removing a section from the page.[5]

18. The LG 65-inch OLED evo AI G6 4K Smart TV performs the step of compiling the textural information for each region using the processing unit (e.g., compiling the row heading and the textual or categorical metadata associated with the titles included in each row); for each region: sorting out words or phrases that are pre-determined to be of no value for determining user interest (e.g., "the," "a," "an," "and," "of," or "to"); compiling a list of the most frequently used words and phrases from words that were not sorted out (e.g., for Suspenseful Crime Dramas region, words like "crime," "murder," "detective," "investigation," "suspense," "dark," "thriller," or "drama"); for regions viewed by the viewer above a specified threshold viewing frequency (e.g., the pointer entering the same row three times) and duration (e.g., pointer activity within a row for

[5] https://netflixtechblog.com/unlocking-dynamic-pages-the-evolution-of-netflixs-client-server-graphql-apis-8b4631a59b39.

a set period), semantically comparing the most frequently used words and phrases to the most frequently used words and phrases of internet based content (e.g., unshown Netflix movies, series, trailers, recommendation collections, or the same content already viewed and identified) that can be supplied to the viewer; and selecting and providing relevant internet based content with semantic similarity (e.g., cosine similarity or another model-based relevance score between metadata embeddings) above a pre-specified threshold value (e.g., a minimum similarity score of 0.75) to the at least one viewer on a display screen as one of: a display of one of the relevant content and a link to the relevant content in one or more of a specified region or little used region of the one or more webpages (e.g., populating a lower, previously unfilled or less prominent portion of the homepage), a new page (e.g., navigating from the homepage to the recommended title's details page, an email advertisement), and a popup (e.g., an expanded title-information panel or preview presented over the homepage).

## Data

At Netflix, user engagement spans a wide spectrum, from casual browsing to committed movie watching. With over 300 million users at the end of 2024, this translates into hundreds of billions of interactions — an immense dataset comparable in scale to the token volume of large language models (LLMs). However, as in LLMs, the quality of data often outweighs its sheer volume. To harness this data effectively, we employ a process of interaction tokenization, ensuring meaningful events are identified and redundancies are minimized.

**Tokenizing User Interactions:** Not all raw user actions contribute equally to understanding preferences. Tokenization helps define what constitutes a meaningful "token" in a sequence. Drawing an analogy to Byte Pair Encoding (BPE) in NLP, we can think of tokenization as merging adjacent actions to form new, higher-level tokens. However, unlike language tokenization, creating these new tokens requires careful consideration of what information to retain. For instance, the total watch duration might need to be summed or engagement types aggregated to preserve critical details.




**Figure 1.** Tokenization of user interaction history by merging actions on the same title, preserving important information.

This tradeoff between granular data and sequence compression is akin to the balance in LLMs between vocabulary size and context window. In our case, the goal is to balance the length of interaction history against the level of detail retained in individual tokens. Overly lossy tokenization risks losing valuable signals, while too granular a sequence can exceed practical limits on processing time and memory.

**Information in Each 'Token'**: While the first part of our tokenization process focuses on structuring sequences of interactions, the next critical step is defining the rich information contained within each token. Unlike LLMs, which typically rely on a single embedding space to represent input tokens, our interaction events are packed with heterogeneous details. These include attributes of the action itself (such as locale, time, duration, and device type) as well as information about the content (such as item ID and metadata like genre and release country). Most of these features, especially categorical ones, are directly embedded within the model, embracing an end-to-end learning approach. However, certain features require special attention. For example, timestamps need additional processing to capture both absolute and relative notions of time, with absolute time being particularly important for understanding time-sensitive behaviors.

To enhance prediction accuracy in sequential recommendation systems, we organize token features into two categories:

1. **Request-Time Features:** These are features available at the moment of prediction, such as log-in time, device, or location.
2. **Post-Action Features:** These are details available after an interaction has occurred, such as the specific show interacted with or the duration of the interaction.




**Figure 2.** Titles are associated with various metadata, such as genres, storylines, and tones. Each type of metadata could be represented by averaging its respective embeddings, which are then concatenated to form the overall metadata-based embedding for the title.

To create the final title embedding, we combine this metadata-based embedding with a fully-learnable ID-based embedding using a mixing layer. Instead of simply summing these embeddings, we use an attention mechanism based on the "age" of the entity. This approach allows new titles with limited interaction data to rely more on metadata, while established titles can depend more on ID-based embeddings. Since titles with similar metadata can have different user engagement, their embeddings should reflect these differences. Introducing some randomness during training encourages the model to learn from metadata rather than relying solely on ID embeddings. This method ensures that newly-launched or pre-launch titles have reasonable embeddings even with no user interaction data.[6]

19. On information and belief, the LG 65-inch OLED evo AI G6 4K Smart TV and other of the Accused Products come with Netflix preinstalled through the LG webOS. For example, the LG 65-inch OLED evo AI G6 4K Smart TV comes with the AI Magic Remote MR26.[7] The AI Magic Remote MR26 remote comes with a dedicated button for opening the

[6] https://netflixtechblog.com/foundation-model-for-personalized-recommendation-1a0bd8e02d39.

[7] *See* https://www.lg.com/us/tvs/lg-oled55g6wua-oled-4k-tv?g_acctid=955-567-4384&g_adgroupid=197007520680&g_adid=801230926993&g_adtype=search&g_campaign=lg_2026_ms_tv_aon_brand_sem_google_npi&g_campaignid=22846884887&g_keyword=lg+g6+oled&g_keywordid=kwd-305255747942&g_network=g&utm_term=lg+g6+oled&gclsrc=aw.ds&gad_source=1&gad_campaignid=22846884887&gbraid=0AAAAADRIrHNSLoVa-mFPVronHEQYl_pxK&gclid=CjwKCAjwpK3SBhASEiwAtV1SPIHcM5oN2kvwEmcIPSmVc

Netflix application.



[8]

20. On information and belief, Defendant's direct infringement of the '115 Patent includes, but is not limited to, testing, development, troubleshooting, and other use in the United States. Defendant also has used and uses the Accused Products at tradeshows in the United States to promote the sale of the Accused Products. By way of example, employees of Defendant demonstrated LG smart televisions at CES 2025, held in Las Vegas, Nevada, allowing consumers to get hands-on experience with the products, while experts demonstrated certain features of the products.[9]

---

4wi8VxoMqqsstUHxAcEcaa6vz-2F2-JihoChT4QAvD_BwE (stating in the "Accessories Included" section under "Remote" the LG 65-inch OLED evo AI G6 4K Smart TV comes with the "AI Magic Remote MR26.").

[8] https://www.lg.com/us/tv-home-theater-accessories/lg-mr26ga-magic-remote?srsltid=AfmBOoq7ntXS99LRxdtR8g5ZN5rwAVguPOYDw84S0RKv9oQDK2mBU55r.

[9] *See* https://www.lg.com/global/newsroom/news/corporate/lg-presents-its-latest-innovations-powered-by-affectionate-intelligence-at-ces-2025/ ("Last but not least, the Escape & Immerse

21. Defendant has and continues to indirectly infringe one or more claims of the '115 Patent by knowingly and intentionally inducing others, including LG customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing into the United States products that include infringing technology.

22. Defendant, with knowledge that these products, or the use thereof, infringe the '115 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continues to knowingly and intentionally induce, direct infringement of the '115 Patent by providing these products to end users for use in an infringing manner. Alternatively, on information and belief, Defendant has adopted a policy of not reviewing the patents of others, and instructing its officers, agents, and employees to not review the patents of others, including specifically those related to Defendant's specific industry, with the subject belief that there was a high probability that Defendant would learn of their infringing activities, thereby remaining willfully blind to the '115 Patent at least as early as the issuance of the '115 Patent.

23. Defendant has induced infringement by others, including end users, with the intent to cause infringing acts by others or, in the alternative, with the subjective belief that there was a high probability that others, including end users, infringe the '115 Patent, but while remaining willfully blind to the infringement. Defendant has and continues to induce infringement by their customers and end-users by supplying them with instructions on how to operate the infringing

---

zone takes CES attendees on a journey of personalized content curation and optimal viewing experiences enabled by LG's α11 AI processor and webOS platform. The zone is divided into an entry area and an experience area, with the latter designed to showcase the capabilities of the α11 and webOS. The entry area features a dramatic man cave atmosphere, where visitors will discover a 'secret door' to experience AI of ***LG TV***, where a digital guide showcases the exciting features of the technology. Highlights include the ***AI-powered Magic Remote***, Voice ID and the cinematic picture and sound quality delivered by α11 AI processor technology.") (emphasis added).

technology in an infringing manner, while also making publicly available information on the infringing technology via Defendant's website, product literature and packaging, and other publications. For example, LG makes available to its customers and end-users various materials that instruct them on how to use LG products in an infringing manner based on the product. These instructional materials include information under topics such as "How to Setup," "How to Operate," "How to Troubleshoot," and "How to Repair." LG also provides information on product use under "Articles," "Manuals & Software," and "Warranty," which include Online Manuals and Owner's Manuals.



[10]

24. On information and belief, these instructional materials are prepared by Defendant or at the direction of Defendant. Because of Defendant's inducement, Defendant's customers and end-users use the Accused Products in a way Defendant intends and directly infringe the '115

[10] *See, e.g.*, https://www.lg.com/us/support/product/lg-OLED65G6WUA.AUS?tab=0.

Patent. Defendant performs these affirmative acts with knowledge of the ’115 Patent and with the intent, or willful blindness, that the induced acts directly infringe the ’115 Patent.



[11]

25. Defendant has indirectly infringed and continues to indirectly infringe one or more claims of the ’115 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendant’s affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others’ use and manufacture of the Accused Products such that the ’115 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the ’115 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendant to be especially made or adapted for use in the infringement of the ’115 Patent. Defendant performs these

[11] LG OLED TV Owner’s Manual, at pg. 1, available for download at: https://www.lg.com/us/support/product/lg-OLED65G6WUA.AUS?tab=0.

affirmative acts with knowledge of the '115 Patent and with subjective intent, or willful blindness, that they cause the direct infringement of the '115 Patent.

26. Stratacor has suffered damages as a result of Defendant's direct and indirect infringement of the '115 Patent in an amount to be proven at trial.

27. Stratacor has suffered, and will continue to suffer, irreparable harm as a result of Defendant's infringement of the '115 Patent, for which there is no adequate remedy at law, unless Defendant's infringement is enjoined by this Court.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury for all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Stratacor prays for relief against Defendant as follows:

a. Entry of judgment declaring that Defendant has directly and/or indirectly infringed one or more claims of each of the Patent-in-Suit;

b. An order pursuant to 35 U.S.C. § 283 permanently enjoining Defendant, its officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, from further acts of infringement of one or more of the Patent-in-Suit;

c. An order awarding damages sufficient to compensate Plaintiff for Defendant's infringement of the Patent-in-Suit, but in no event less than a reasonable royalty, together with interest and costs;

d. Entry of judgment declaring that this case is exceptional and awarding Plaintiff its costs and reasonable attorney fees under 35 U.S.C. § 285; and

e. Such other and further relief as the Court deems just and proper.

Dated: July 10, 2026

Respectfully submitted,

*/s/ John Andrew Rubino*
John Andrew Rubino
NY Bar No. 5020797
Email: jarubino@rubinoip.com
Michael Mondelli III
NY Bar No. 5805114
Email: mmondelli@rubinoip.com
**RUBINO IP**
1200 Harbor Blvd., 10th Floor
Weehawken Township, NJ 07086
Telephone: (201) 341-9445
Facsimile: (973) 535-0921

***ATTORNEYS FOR PLAINTIFF, STRATACOR LLC***